EDWARD C. SULLIVAN, President
JOSEPH MALONEY, Secretary-Treasurer

CHARLES W. JONES, 1st Vice President
EARL J. KRUSE, 2nd Vice President
WILLIAM G. BERNARD, 3rd Vice President
FRANK HANLEY, 4th Vice President
JOHN J. DOUGHERTY, 5th Vice President



MARTIN J. MADDALONI, 6th Vice President
MICHAEL E. MONROE, 7th Vice President
MICHAEL J. SULLIVAN, 8th Vice President
JAMES P. HOFFA, 9th Vice President
JOHN J. FLYNN, 10th Vice President
TERENCE M. O'SULLIVAN, 11th Vice President
DANA A. BRIGHAM, 12th Vice President
EDWIN D. HILL, 13th Vice President
JOSEPH J. HUNT, 14th Vice President

## Building and Construction Trades Department

AMERICAN FEDERATION OF LABOR—CONGRESS OF INDUSTRIAL ORGANIZATIONS
815 SIXTEENTH ST., N.W., SUITE 600 • WASHINGTON, D.C. 20006-4104

(202) 347-1461                  FAX (202) 628-0724

July 25, 2001

Annabelle T. Lockhart, Acting Administrator
Wage and Hour Division
United States Department of Labor
200 Constitution Avenue, N.W.
Washington, D.C. 20210

Dear Ms. Lockhart:

Pursuant to the authority delegated to you by the Secretary of Labor conferred on her by the Davis-Bacon Act, as amended, Reorganization Plan No. 14 of 1950, and Section 5.13 of the regulations implementing the aforesaid reorganization plan, 29 C.F.R. § 5.13 (2000), this is a request for a ruling relating to application of the Davis-Bacon Act to construction of facilities on land adjacent to the U.S. Department of Energy's ("DOE") Oak Ridge National Laboratory in Oak Ridge, Tennessee ("ORNL").

### I.    Statement of Facts

On September 11, 2000, former Secretary of Energy Bill Richardson announced a five-year plan to modernize The Oak Ridge National Laboratory's facilities. *See* ORNL Reporter, No. 20, October 2000 published by UT-Battelle, LLC that is appended hereto as Attachment No. 1, at p. 1. The plan includes the construction of eleven (11) major facilities and the renovation of several others over the next five years. *Id.* ORNL Director Bill Madia characterized the five-year modernization plan as "the largest construction effort on the ORNL site since the Manhattan Project in 1943." *Id.*

The five-year plan announced by Secretary Richardson is part of the Oak Ridge National Laboratory Facilities Revitalization Project "that has been established . . . to provide new and/or refurbished research and support facilities for the Laboratory's science mission." *See* Oak Ridge National Laboratory Facilities Revitalization Project – Project Management Plan that is appended hereto as Attachment No. 2, Executive Summary at p. ix.



**PLAINTIFF'S
EXHIBIT**

No. 1

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 2

The three privately funded buildings included in the five-year plan are a Computational Science Building, an Engineering Technology Facility, and a Research Office Building. A drawing of the ORNL Master Plan for Site Development that illustrates the juxtaposition of these three buildings together with a state-funded computer science facility and a federally funded research support center is appended hereto as Attachment No. 3. In addition, an architectural rendering of the five buildings is appended hereto as Attachment No. 4.

One of the most innovative features of the five-year plan involves the long-term transfer of DOE land on the present ORNL site, making possible construction of four new facilities funded by the State of Tennessee and the three buildings described above with private funding. See Attachment No. 1, ORNL Reporter, No. 20, October 2000 at p. 1. The ORNL Reporter described the partnership between DOE, the State and the private sector as "the first of its kind in the nation and a potential model for other national laboratories." Id. at p.9. Accordingly, pursuant to the five-year plan, DOE recently conveyed by quitclaim deed title to a parcel of land on the Oak Ridge Reservation in Roane County, Tennessee that is part of what is known as the East Campus to the UT-Battelle Development Corporation, a private non-profit § 501(c)(3), which later described itself in a Request for Proposal as "dedicated to constructing facilities that will assist [DOE] in meeting its missions under the Atomic Energy Act." See Draft Copy of Quitclaim Deed dated 5-17-01 that is appended hereto as Attachment No. 5[1] ("Quitclaim Deed") and Request for Proposal FRP01 appended hereto as Attachment No. 6 ("Request for Proposal").[2]

Condition No. (9) of the Quitclaim Deed describes the consideration provided by UT-Battelle Development Corporation for this conveyance as "the intended benefit to be derived by [the United States of America, acting by and through the Secretary of the Department of Energy] for facilities to be developed and utilized by the [DOE's] primary contractor to accomplish [DOE-assigned mission activities in support of the Atomic Energy Act of 1954, as amended." Accordingly, Condition No. (10) in the Quitclaim Deed provides that "the property herein conveyed shall be used by [UT-Battelle Development Corporation] for purposes consistent with and in furtherance of the Atomic Energy Act of 1954. Condition No. (10) of the Quitclaim Deed also states that "the land and all interests thereto, are subject to the reversionary rights by [DOE] as set forth in Condition No. (18) cited herein" in the event that UT-Battelle Development Corporation

---

[1]    The Quitclaim Deed identified herein as Attachment No. 5 is attached to Request for Proposal FRP01 as Exhibit C.

[2]    Request for Proposal FRP01 and all of the exhibits attached thereto including many of those appended hereto as separate attachments can be viewed at www.utbdc.com.

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 3

"does not utilize the land in a manner consistent with the anticipated use cited above
within a period of two (2) years from the effective date of this conveyance . . . ."

Furthermore, Condition No. (12) of the Quitclaim Deed reserves to DOE the right
to repurchase all or any part of the land conveyed along with any improvements
constructed on the premises during the term of an anticipated lease between UT-
Battelle Development Corporation and an as-yet-to determined developer that will
construct facilities for the purpose of achieving DOE-assigned mission activities in
support of the Atomic Energy Act of 1954 that may not exceed a term of twenty-five (25)
years. Finally, Condition No. (14) prohibits UT-Battelle Development Corporation from
conveying title to any portion of the former DOE land to another party unless DOE
elects not to repurchase the land and facilities as provided in the Quitclaim Deed.

Thereafter, on or about April 20, 2001, UT-Battelle Development Corporation
issued a Request for Proposal that solicited proposals "for the design, construction, and
lease of three new facilities: 1) a Computational Science Building (CSB); 2) an
Engineering Technology Facility (ETF); and 3) a Research Office Building (ROB)." *See*
Attachment No. 6. The Request for Proposal further stated that an option for expansion
of heating and cooling services to two (2) other buildings in the East Campus is also
included as part of [UT-Battelle Development Corporation's] requirements." *Id.*

The Request for Proposal explains that construction of the three facilities on the
property conveyed by DOE to UT-Battelle Development Corporation will be
accomplished by a private developer selected in response to the Request for Proposal
pursuant to a Ground Lease, a draft of which is appended hereto as Attachment No. 7.[3/]
Section 1.02 of the draft Ground Lease states that it shall be for a term of twenty-five
(25) years subject to possible extension to thirty (30) years unless terminated sooner as
otherwise provided. Article III of the Ground Lease states that the rent for the entire term
of the lease will be $ 1.00. *Id.*

According to Section 13.01 of the Ground Lease, "DOE is recognized by [UT-
Battelle Development Corporation and the private developer selected in response to the
Request for Proposal] as having a primary financial and mission interest in the Building
Improvements to be constructed on the Premises. *Id.* Section 13.01 further states that
"[t]he intent of DOE is to provide authority and reimbursement for its primary contractor
to subsequently lease space from [UT-Battelle Development Corporation] in the facilities
to be constructed by the Developer." *Id.*

---

[3/]    The draft Ground Lease identified herein as Attachment No. 7 is appended to
Request for Proposal FRP01 as Exhibit D.

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 4

The Request for Proposal further explains that each of the three newly constructed facilities will then be leased back to UT-Battelle Development Corporation by the yet-to-be chosen developer pursuant to three separate Facility Leases. A copy of the draft Facility Lease that will be executed by UT-Battelle Development Corporation with the developer selected in response to the Request for Proposal is appended hereto as Attachment No. 8.[4]

The Request for Proposal spells out that each Facility Lease will contain a rent amount based on the estimated building costs and other costs specified in the Proposal to Lease Space that is appended hereto as Attachment No. 9.[5] In fact, the Request for Proposal relates that rent for each of the facilities will, if necessary, be adjusted following completion of the majority of design activity and receipt of the construction cost bids in accordance with Section 1.07 of the Construction Addendum that is appended hereto as Attachment No. 10;[6] however, according to the Request for Proposal, the annual rent for each facility may not exceed $ 2 million per year, exclusive of operating costs.

Furthermore, the Request for Proposal indicates that each Facility Lease contains a term of twenty-five (25) years, with a possible maximum term of thirty (30) years. Moreover, the Request for Proposal relates that the Ground Lease and the "latest" Facility Lease will have a common expiration date. Finally, the Request for Proposal states that UT-Battelle Development Corporation will only be able to terminate the Facility and Ground Leases upon default by the yet-to-be chosen developer.

In turn, the Request for Proposal makes clear that UT-Battelle Development Corporation will then sublease the completed facilities to DOE's Maintenance and Operations Contractor, UT-Battelle, LLC, pursuant to three separate Subleases of Real Property. A copy of the Draft Sublease of Real Property is appended hereto as Attachment No. 11.[7] The initial term of each Sublease of Real Property between UT-

---

[4]    The draft Facility Lease identified herein as Attachment No. 8 is attached to Request for Proposal FRP01 as Exhibit E.

[5]    The Proposal to Lease Space identified herein as Attachment No. 9 is attached to Request for Proposal FRP01 as Exhibit G.

[6]    The Construction Addendum identified herein as Attachment No. 10 is attached to Request for Proposal FRP01 as Exhibit H.

[7]    The Draft Sublease of Real Property identified herein as Attachment No. 11 is attached to Request for Proposal FRP01 as Exhibit F.

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 5

Battelle Development Corporation and DOE's Maintenance and Operations Contractor, UT-Battelle, LLC, will be ten (10) years and will be subject to the right of termination and possible extensions for a period not to exceed twenty-five (25) years or DOE's possible repurchase of the premises under the terms of the Quitclaim Deed. *See* Attachment No. 3.

DOE Chief Counsel Jennifer J. Fowler advised Robert J. Brown, Chairman of the Oak Ridge Operations Labor Standards Committee, in a memorandum dated February 16, 2001 as follows:

> This memorandum confirms our conversation regarding the Davis-Bacon Act and the ORNL Revitalization project. As I explained, the UT-Battelle proposal for revitalization of facilities at ORNL concluded that the Davis-Bacon Act did not apply to the State and private sector construction activities contemplated therein. The proposal received extensive review by DOE Headquarters which agreed with UT-Battelle's conclusion regarding the Davis-Bacon Act.

A copy of Ms. Fowler's February 16, 2001 memorandum is appended hereto as Attachment No. 12. Additionally, DOE advised prospective developers and contractors in response to a written question that the Davis-Bacon Act does not apply to construction of the three facilities that are the subject of the Request for Proposal appended hereto as Attachment No. 6. *See* Question and Answer No. 68 in the Questions and Answers concerning this project that are appended hereto as Attachment No. 13.[8/]

Thus, DOE has unequivocally determined that Davis-Bacon prevailing wage requirements do not apply to construction of the privately funded Computational Science Building, the Engineering Technology Facility, and the Research Office Building that are included in its five-year plan for modernizing the ORNL. The Building and Construction Trades Department, AFL-CIO, strongly disagrees with DOE's determination, and requests that you rule as soon as possible that the Davis-Bacon Act covers construction of the privately funded Computational Science Building, the Engineering Technology Facility, and the Research Office Building at the ORNL.

In the meantime, the Building and Construction Trades Department, AFL-CIO, asks that DOE instruct UT-Battelle Development Corporation to advise those competing for selection to develop the property conveyed by Quitclaim Deed pursuant to the Request for Proposal that a question has been raised concerning application of the

---

[8/]    It should be noted that the Questions and Answers set forth in Attachment No. 13 were provided by DOE in reverse numerical order.

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 6

Davis-Bacon Act to construction on that property and that, pending resolution of that issue by the U.S. Department of Labor, they should plan to apply federal prevailing wage requirements to such construction work.

## II.   Discussion of the Issues

The Davis-Bacon Act provides:

(a)     The advertised specifications for *every contract* in excess of $2,000, to which the United States or the District of Columbia is a party, *for construction, alteration, and/or repair, including painting and decorating, of public buildings or public works of the United States or the District of Columbia* . . . and which requires or involves the employment of mechanics and/or laborers shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics which shall be based upon the wages that will be determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the city, town, village, or other civil subdivision of the State in which the work is to be performed .

40 U.S.C.A. §276a(a) (emphasis added).

When a federal agency enters directly into a contract for the construction of a public building or public work that will be owned by the Federal Government, application of the Davis-Bacon Act is ordinarily clear. However, when agencies use other financing or contractual vehicles for acquiring spaces or structures that will be used for public purposes such as leases, the question of Davis-Bacon coverage becomes more complicated.

For several years, there was disagreement concerning application of the Davis-Bacon Act to construction of privately owned buildings and other structures intended for lease to the United States. Then, in *Military Housing Ft. Drum, New York*, WAB Case No. 85-16 (Aug. 23, 1985), the Wage Appeals Board, the predecessor of the Department of Labor's Administrative Review Board, determined that lease by the U.S. Army of privately financed housing units near Ft. Drum, New York for a term of twenty (20) years qualified as a "contract for construction" of "public buildings" and, therefore, construction of the housing units was covered by the Davis-Bacon Act.

Less than two years later, the Wage Appeals Board held in *Applicability of Davis-Bacon Act to Lease of Space for Outpatient Clinic, Crown Point, Indiana*, WAB Case No. 86-33 (June 26, 1987), that the Davis-Bacon Act applied to construction of a building which a private developer built expressly for lease to the Veterans

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 7

Administration (now the Department of Veterans' Affairs) ("VA") for use as an outpatient clinic for fifteen (15) years with an option by the VA to lease it for an additional five (5) more years.[9/]

The VA refused, however, to comply with the Board's decision and sought, instead, an opinion on the matter from the Attorney General pursuant to Executive Order 12146. Thereafter, on June 6, 1988, the Office of Legal Counsel issued an opinion to the VA that held that the plain language of the Davis-Bacon Act bars its application to *any* lease contract, whether or not the lease also calls for construction of a public building or public work. *Applicability of the Davis-Bacon Act to the Veterans Administrations' Lease of Medical* Facilities, 12 U.S. Op. Off. Legal Counsel 89 (June 6, 1988) (*1988 OLC Opinion*). Accordingly, the *1988 OLC Opinion* concluded that the Crown Point lease was not a "contract for construction" within the meaning of the Davis-Bacon Act.[10/]

---

[9/]    More recently, in *Phoenix Field Office, Bureau of Land Management*, ARB Case No. 01-010 (June 29, 2001), the Department of Labor's Administrative Review Board considered the question of whether the prevailing wage requirements of the Davis-Bacon Act apply to construction of a privately owned building and storage facility built for the Interior Department's Bureau of Land Management ("BLM") pursuant to a fifteen (15) year lease. In *Phoenix Field Office, Bureau of Land Management*, the Board rejected the BLM's argument that the lease in question was for a shorter period of time than the leases in either the *Ft Drum* or the *Crown Point* situations. The Board said: "This slightly shorter term is a difference merely in degree, not in substance." *Id.*, slip op. at 11. The Board also rejected the argument that the Phoenix complex is not a public building because it will revert to private use. The Board characterized that possibility as being of little decisional value in determining the context of the construction contract, adding that in some situations the Government's lease can be extended. Moreover, the Board noted that many buildings directly constructed and owned by the Federal Government could be relinquished at some point.

[10/]    It should be noted that, in the interim, the Building and Construction Trades Department, AFL-CIO, sued the VA Administrator to compel him to comply with the Wage Appeals Board's ruling. In an Order issued on September 6, 1988, U.S. District Court held that the 1988 OLC Opinion did not vacate or supersede the Wage Appeals Board's *Crown Point* decision. The court found that the 1988 OLC opinion merely defined the Government's litigating position in the case. *Building and Construction Trades Department, AFL-CIO v. Turnage*, 28 Wage & Hour Cas. (BNA) 1565 (D.D.C. 1988).

Subsequently, the court held in *Building and Construction Trades Department, AFL-CIO v. Turnage*, 705 F. Supp. 5 (D.D.C. 1988), that the Wage Appeals Board

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 8

Six years later, the Justice Department's Office of Legal Counsel revisited the "leased construction" question in 1994, and found in *Reconsideration of Applicability of the Davis-Bacon Act to the Veterans Administration's Lease of Medical Facilities*, 18 U.S. Op. Off. Legal Counsel 109 (May 23, 1994) ("*1994 OLC Opinion*") that:

> the 1988 [OLC] Opinion erred in concluding that the plain language of the Davis-Bacon Act bars its application to any lease contract, whether or not the lease also calls for construction of a public work or public building. We believe that the applicability of the Davis-Bacon Act to any specific lease contract can be determined only by considering the facts of the particular contract.

*1994 OLC Opinion*, slip op. at 1.

The *1994 OLC Opinion* then concluded:

> We believe that, in general, the determination whether a lease-construction contract calls for construction of a public building or public work likely will depend on the details of the particular arrangement. These may include such factors as the length of the lease, the extent of government involvement in the construction project, the extent to which the costs of construction will be fully paid for by the lease payments, and whether the contract is written as a lease solely to evade the requirements of the Davis-Bacon Act, a possibility contemplated by the dissenter from the 1987 WAB [*Crown Point*] Opinion. However, we further believe that the fact that a novel financing mechanism is employed should not in itself defeat the reading of such a contract as being a contract for construction of a public building or public work.

*1994 OLC Opinion*, slip op. at 11, n.10.

---

(Footnote continued) . . . .

reasonably concluded the Davis-Bacon Act was meant to apply to a lease in which construction is more than an incidental element, and therefore, the contract for lease of The Davis-Bacon Act covered space in Crown Point, Indiana for use as a VA outpatient clinic. Accordingly, the court found that the VA Administrator had unlawfully withheld compliance with the Wage Appeals Board's *Crown Point* decision, and ordered him to amend the VA's contract with the developer, and incorporate Davis-Bacon Act requirements into it.

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 9

Wage and Hour Administrator Maria Echaveste adopted the factors identified in the _1994 OLC Opinion_ that should be considered in determining whether a lease/construction contract calls for construction of a public building or public work in All Agency Memorandum No. 176.

Applying these factors to the project to construct the Computational Science Building, Engineering Technology Facility and Research Office Building on land owned by the Oak Ridge National Laboratory until recently conveyed to the UT-Battelle Development Corporation for the sole and express purpose of having these buildings constructed, it is very clear that the construction is covered by the Davis-Bacon Act for the same reasons that the construction work in the _Ft. Drum_, _Crown Point_ and _Phoenix Field Office, Bureau of Land Management_ cases was covered.

### A.    Length of the Lease.

Both the Ground Lease and the three separate Facility Leases between the yet-to-be chosen developer and UT-Battelle Development Corporation will be for simultaneous terms of 25 years with an option to extend them to 30 years. As such, these leases are for longer terms than those in _Ft. Drum_ (20 years), _Crown Point_ (15 years) and _Phoenix Field Office, Bureau of Land Management_ (15 years). The longer the term of the lease pursuant to which a building or other structure will be constructed, the more it takes on the character of a "public building" or "public work" of the United States, construction, repair and/or alteration of which is covered by the Davis-Bacon Act.

### B.    The Extent of Government Involvement in the Construction Project.

Review of the Request for Proposal in this case provides a substantial amount of evidence that DOE is substantially involved in construction of the Computational Science Building, an Engineering Technology Facility and a Research Office Building at the ORNL. In fact, DOE describes two of the three buildings that will be constructed pursuant to this contractual relationship, _i.e._, the Computational Science Building and the Engineering Technology Facility, as two of the three facilities that will help a DOE-owned building called the Forum, create a new center for the research campus envisioned in the ORNL Master Plan.[11]

---

[11]    The Oak Ridge National Laboratory Master Plan, Attachment No. 1 appended hereto, at p. 4, describes the Forum, which will be located at the heart of the campus, as the most important structure scheduled for construction during Phase I of the Plan. It will contain a large cafeteria, a major auditorium, meeting rooms, break out spaces, and possibly the ORNL's library, as well as visitor reception spaces and display areas.

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 10

Evidence of DOE's involvement in this construction project begins with the characterization of the consideration in the Quitclaim Deed for conveyance by DOE of the parcel of ORNL land to UT-Battelle Development Corporation upon which the three "privately funded" buildings will be constructed as "the intended benefit to be derived by [DOE] for facilities to be developed and utilized by [DOE's] primary contractor [UT-Battelle, LLC] to accomplish [DOE]-assigned mission activities in support of the Atomic Energy Act of 1954, as amended." *See* Condition No. (9) of the Draft Copy of Quitclaim Deed dated 5-17-01 that is appended hereto as Attachment No. 4 at p.3. Likewise, Condition No. (10) of the Quitclaim Deed says, "[e]xcept as provided in Condition No. (13), the property herein conveyed shall be used by the GRANTEE [UT-Battelle Development Corporation] for purposes consistent with and in furtherance of the Atomic Energy Act of 1954." *Id.* Furthermore, Condition No. (10) of the Quitclaim Deed provides:

> In the event the Grantee [UT-Battelle Development Corporation] does not utilize the land in a manner consistent with the anticipated use cited [therein] within a period of two (2) years from the effective date of [the] conveyance, the land and all interests thereto, are subject to the reversionary rights by [DOE] s set forth in Condition No. (18) cited herein. IN the event developmental activities are begun and subsequently halted by the GRANTEE [UT-Battelle Development Corporation] or its successors, representatives, agents, or assigns for a period exceeding one (1) year, the land and all facilities located thereon, are subject to the reversionary rights by {DOE} pursuant to Condition No. (18) below.

*Id.*

Moreover, Condition No. (12) of the Quitclaim Deed asserts that DOE "reserves to itself on behalf of the Government, its agents, representatives, and assigns, *the prior right to repurchase all or any part of said premises and property herein conveyed along with any improvements constructed on the premises subsequent to the date of this conveyance.* " *Id.* (emphasis added). Condition No. 12 further specifies that "the lease documents entered into between the GRANTEE [UT-Battelle Development Corporation] and the developer for construction of facilities will provide that at the end of a term concurred in by [DOE] and not to exceed twenty-five (25) years, title to the improvements will be automatically vested in the name the GRANTEE [UT-Battelle Development Corporation]. *Id.*

It is obvious that the Quitclaim Deed between DOE and UT-Battelle Development Corporation is crucial to the contractual relationship contemplated by DOE as the means of accomplishing construction of the Computational Science Building, the Engineering Technology Facility, and the Research Office Building that are integral

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 11

components of DOE's Master Plan for transforming the ORNL into a "true research campus." Nonetheless, the key document in this multi-party contractual relationship is the Ground Lease that will be awarded shortly by UT-Battelle Development Corporation to a yet-to-be chosen private developer.

That is, the Quitclaim Deed will be attached to and made a part of the Ground Lease, which, together with a Construction Addendum and the Performance Specifications attached to the Request for Proposal as Exhibit A,[12] both of which will be appended to the Ground Lease, sets forth the terms and conditions applicable to construction of the Computational Science Building, the Engineering Technology Facility, and the Research Office Building.

Specifically, Section 6.01 of the Ground Lease, which is appended hereto as Attachment No. 6 at p. 4, spells out that construction of the Computational Science Building, the Engineering Technology Facility, and the Research Office Building "shall be of good and workmanlike quality, *in conformance with the Performance Specifications, Plans as defined in Section 1.01(c) of the Construction Addendum, and this Lease . . . .*"

The Plans to which Section 6.01 of the Ground Lease refers are described in Section 101(c) of the Construction Addendum that will be attached to and incorporated in the Ground Lease as:

> The plans prepared by the [yet-to-be chosen] Developer and approved by [UT-Battelle Development Corporation]. The plans shall include the design drawings and specifications including the Schematics, Design Drawings, Mechanical Documents, and Construction Documents as they are defined in Sections 1.01(k), (l) and (m) below. The Building Improvements [*i.e.*, Computational Science Building, the Engineering Technology Facility, and the Research Office Building] shall be erected and completed by the Developer, in accordance with the Performance Specifications and the Plans described below, and shall contain [UT-Battelle Development Corporation's] specific requirements for the operation [its] business, which requirements will include, among other things, the items and installations listed in the Performance Specifications.

Ground Lease appended hereto as Attachment No. 7, at p. 1.

_____

[12] Copies of the Performance Specifications for the Computational Science Building, the Engineering Technology Facility, and the Research Office Building are appended hereto as Attachment Nos. 14, 15 and 16, respectively.

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 12

In turn, the Performance Specifications for each of the three buildings referenced in the Ground Lease, which are set forth in Exhibit A of the Request for Proposal and will be attached to and incorporated into the Ground Lease, contain detailed descriptions of not only the overall character of each of the buildings, but also the required improvements to the land, structural designs, architecture, HVAC systems, plumbing requirements, fire protection systems, electrical systems, communications, building security, and building commissioning. See Attachment Nos. 14, 15 and 15 appended hereto. These performance specifications can only be characterized as construction requirements. In fact, the Performance Specifications are as detailed as those in most traditional construction contracts. Moreover, it does not matter that the Performance Specifications give the yet-to-be chosen developer a substantial amount of flexibility to meet some of the buildings' respective specifications. In *Ft. Drum*, the Wage Appeals Board recognized that the Davis-Bacon Act covered a lease/ construction agreement "although the developers are given the flexibility to select the design, the materials, and equipment for the project . . . ." *Ft. Drum*, slip op. at 15.

Thus, it can be said with the greatest of confidence that three new buildings, intended for the sole and exclusive benefit of DOE, would be constructed in accordance with the specifications set forth in the Ground Lease that will be awarded by UT-Battelle Development Corporation. Nonetheless, the contractual arrangement created to construct these three buildings is more complex than those pursuant to which family military housing, a VA outpatient clinic, and a BLM field office and storage facility were constructed on private land with private financing in *Ft. Drum*, *Crown Point* and *Phoenix Field Office, Bureau of Land Management*, respectively.

In this case, unlike these prior cases, the federal agency will not enter directly into a long-term lease/construction contract with a private developer and then lease the newly constructed facilities back from the private owner, as was the done in *Ft. Drum*, *Crown Point* and *Phoenix Field Office, Bureau of Land Management*. Instead, DOE first conveyed federal land to a private entity, UT-Battelle Development Corporation, pursuant to a tightly written quitclaim deed that virtually compels the latter company to construct the three facilities, which DOE wants to build as part of its Master Plan to transform the ONLR into a research campus. Notwithstanding, introduction of an intermediate non-governmental entity into the contractual relationship that acts as a sort of buffer between DOE and the private developer does not diminish the substantial extent of the Federal Government's involvement in the construction project envisioned in the Ground Lease to be awarded by UT-Battelle Development Corporation to a yet-to-be chosen private developer.

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 13

### C.    The Extent to Which the Construction Will be Used for Private Rather Than Public Purposes.

The yet-to-be chosen private developer will enter into three separate Facility Leases pursuant to which the entire amount of net useable square footage available in the Computational Science Building, the Engineering Technology Facility and the Research Office Building constructed in accordance with the specifications in the Ground Lease will be rented by UT-Battelle Development Corporation for a term of twenty-five (25) years. UT-Battelle Development Corporation will then enter into three separate Subleases of Real Property with UT-Battelle, LLC, DOE's Maintenance & Operations Contractor at the ORNL, pursuant to which DOE and UT-Battelle, LLC personnel will occupy the entire net useable space in the respective buildings constructed by the yet-to-be chosen private developer for an initial term of ten (10) years with possible option extensions for a period not to exceed twenty-five (25) years or DOE's possible repurchase of the premises under the terms of the Quitclaim Deed that originally conveyed the land to UT-Battelle Development Corporation on which each of the three buildings is located.

Consequently, each of the three buildings that will be constructed by the yet-to-be chosen private developer in accordance with the Ground Lease awarded by UT-Battelle Development Corporation will be used exclusively for public purposes for at least the first twenty-five years. No private use of these buildings is contemplated by the contractual relationship described in the Quitclaim Deed, the Ground Lease, the Facility Leases and the Subleases of Real Property.

### D.    The Extent to Which the Costs of Construction will be Fully Paid for by the Lease Payments.

The information available to the public at this time does not indicate either the collective or individual estimated cost of constructing the Computational Science Building, the Engineering Technology Facility, and the Research Office Building. Consequently, the Building and Construction Trades Department, AF-CIO, cannot represent, as a matter of fact, that the costs of constructing these three buildings will be fully paid for by the lease payments. Notwithstanding, there is substantial evidence that indicates the yet-to-be developer will be assured of recovering the cost of constructing the Computational Science Building, the Engineering Technology Facility, and the Research Office Building during the term of its twenty-five (25) year Ground Lease with UT-Battelle Development Corporation.

First of all, Section 4 of each Facility Lease provides that UT-Battelle Development Corporation will pay rent monthly to the yet-to-be chosen private developer beginning on the date on which UT-Battelle Development Corporation

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 14

"occupies and begins conducting business on the premises" or "[n]inety (90) days after the date of the Acknowledgement of Substantial Completion, as defined in the Construction Addendum [which must be attached to and made a part of the Facility Lease]. *See* Facility Lease appended hereto as Attachment No. 8 at p. 2.

In addition, Section 5 of each Facility Lease provides that UT-Battelle Development Corporation will pay the yet-to-be chosen private developer affixed amount each month for operating expenses.[13] *Id.* Section 5 also states that "[t]he Operating Expenses Payment amount shall be the only amount due and owing by [UT-Battelle Development Corporation] to the [yet-to-be chosen private developer] for Operating Expenses regardless of the actual expenses incurred by the [latter]." Additionally, Section 5 of each Facility Lease provides that the amount of the Operating Expenses will be adjusted every three (3) years "based on the [yet-to-be chosen private developer's] actual operating experience with a cap on adjustments based on the annual United States Consumer Price Index. *Id.* What is more, Section 9 of each Facility Lease states that UT-Battelle Development Corporation will be responsible for paying "all valid real and personal property tax assessments imposed on the property during the term of the lease. *Id.* at p. 3.

Moreover, Section 4 of each Facility Lease provides that the rent may be adjusted under certain circumstances. Specifically, Section 1.07 of the Construction Addendum that is attached and made a part of the Facility Lease, and which is appended hereto as Attachment No. 10, contains a process by which the initially agreed-upon may be increased or decreased depending on the actual contract price of the accepted bid for the cost of constructing the building to be rented back to UT-Battelle Development Corporation, provided that rent for the building cannot exceed $2 million. Section 4 of each Facility Lease also provides that, in the event the actual contract price of the accepted bid for the cost of constructing the building to be rented back to UT-Battelle Development Corporation would require annual rent of more than $ 2 million, the parties can agree to increase the originally-agreed upon term of the Facility Lease, provided it does not exceed thirty (30) years, in order to reduce the amount of the annual rent, or they can agree to terminate the Ground Lease and the Facility Lease(s).

---

[13]    "Operating expenses" is defined in the Facility Lease as "those expenses required to properly maintain the Premises, assure all systems remain functional for the Term [of the Facility Lease] perform the services required by Section 12 [maintenance and repair of the facility], pay for insurance required by Sections 23 and 25 [of the Facility Lease], and pay] the yet-to-be chosen private developer's] management fee and other overhead costs."

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 15

As a result, although the yet-to-be chosen private developer is not absolutely assured that it will recover the entire cost of constructing the Computational Science Building, the Engineering Technology Facility, and the Research Office Building at the ORNL during the term of its Facility Leases with UT-Battelle Development Corporation, because the cost of their maintenance and repair might over the term of the lease dramatically exceed the reimbursable Operating Expenses Payment authorized by Section 5 of each Facility Lease, the provisions of the Facility Lease would seem to fairly well assure the yet-to-be chosen private developer that it will recover the cost of construction of the Computational Science Building, the Engineering Technology Facility, and the Research Office Building during the term of the respective Facility Leases.

E.    **Whether the Contract is Written as a Lease Solely to Evade the Requirements of the Davis-Bacon Act.**

The final factor to consider is whether the contract is written as a lease *solely* to evade the requirements of the Davis-Bacon Act. Presumably, evidence of such a motive would justify application of the Davis-Bacon Act to the lease even if none of the other factors were satisfied. In this case, there is no evidence that the *sole* reason for creating the contractual relationship developed by DOE and its Maintenance and Operations Contractor, UT-Battelle, LLC, was to evade the Davis-Bacon Act. Nonetheless, a presentation by UT-Battelle, LLC to DOE on August 30, 2000 concerning its plan for revitalization of ORNL facilities clearly asserts that its proposal to convey a parcel of ORNL land to the UT-Battelle Development Corporation in order to construct the Computational Science Building, the Engineering Technology Facility, and the Research Office Building with private funding would avoid application of the Davis-Bacon Act, as well the project labor agreement negotiated by the Knoxville Building and Construction Trades Council that is applicable to construction work performed for DOE at the ORNL. *See* "Strategy and Issues Associated with Making Infrastructure Revitalization Investments at DOE's Oak Ridge National Laboratory Prepared for DOE-HQ August 30, 2000" appended hereto as Attachment No. 17 at p. 16.

Consequently, while it cannot be said that the *sole* reason that DOE and UT-Battelle, LLC devised the contractual relationship to have the Computational Science Building, the Engineering Technology Facility, and the Research Office Building constructed with private funding pursuant to twenty-five (25) to thirty (30) year leases described hereinabove is to evade application of the Davis-Bacon Act to construction of these buildings, it is reasonable to conclude that it was one of the reasons.

Annabelle T. Lockhart, Acting Administrator
July 25, 2001
Page No. 16

III.    **Conclusion**

I hope that you will agree with me that construction of the Computational Science Building, the Engineering Technology Facility, and the Research Office Building at the ORNL is covered by the Davis-Bacon Act, and that you will quickly advise DOE of your ruling to that effect.

With kind regards, I am

Sincerely,

*Edward C. Sullivan*

Edward C. Sullivan
President

ECS/lmd

Enclosures

cc:    BCTD General Presidents
The Honorable Spencer Abraham, Secretary of Energy
William Madia, Director, Oak Ridge National Laboratory